IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PLAINTIFF | CAUSE NO. _____ |
| **HAROLD GAUSE** | **JURY TRIAL DEMANDED** |
| VS. | |
| DEFENDANTS | |
| **U.S. DEPARTMENT OF VETERANS AFFAIRS) DOUGLAS A. COLLINS (SECRETARY) (OFFICIAL CAPACITY)** | |

1

## PLAINTIFF'S COMPLAINT

### I.

This court has jurisdiction under 28 U.S.C. § 1331. Federal question jurisdiction gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States. Additionally, the case arises out of the actions of a federal agency as defendant and therefore jurisdiction is proper pursuant to 28 U.S.C. § 1346.

### II.

Jurisdiction is appropriate against the Department of Veterans Affairs pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000c; and the Federal Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8)-(9). Jurisdiction is also proper under 5 U.S.C. §7702(e)(1)(B) as this is a "mixed case" complaint upon which no decision has been taken by the Merit Systems Protection Board (Board) for 120 days. Jurisdiction also exists because the Plaintiff opposed an unlawful employment practice as defined under 42 U.S.C. § 2000e-3(a).

### III.

Jurisdiction is also appropriate because the defendant is a federal agency pursuant to 28 U.S.C. § 1346.

## IV.

Venue is appropriate in the Southern District of Texas under 28 U.S.C. §1391 as the federal defendant's continental district office is located in Houston, Texas, the plaintiff resides in Harris County, Texas, and the majority of acts complained of under the various statutes occurred in Houston, Texas, where the Plaintiff, Harold K. Gause operated as a remote employee. The Civil Rights Act of 1964 also posits venue in the place where the conduct complained of arose.

## V.

**PARTIES**

**Plaintiff, Harold K. Gause** was an eeo investigator/eeo specialist for the Office of Resolution Management Diversity and Inclusion (ORMDI) which currently is titled Office of Resolution and Management. (ORM) which was an equal employment opportunity investigative department under the Department of Veterans Affairs. (VA)

**Defendant, Doug Collins, Secretary of the Department of Veterans Affairs (VA")** is the agency head and federal Agency who, under 28 U.S.C. § 1346, is the properly named party for claims arising against the United States.

3

The **United Sates Attorney's Office for the Southern District of Texas** can be served at 1000 Louisiana St., Suite 2300 Houston, Texas 77002, and the **U.S. Department of Veterans Affairs** can be served at the Office of Chief Counsel (02) 155 Van Gordon, Suite 551 Lakewood, CO 8022, and the **United States Attorney General** can be served at the U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, DC 20530-0001

## VI.

## INTRODUCTION/SUMARY/FACTS

1.  Mr. Gause hereby appeals to this Court from the Merit System Protection Board (MSPB or Board) where the Board has failed to issue a decision within 120 days of filing a mixed case appeal.

2.  Mr. Gause filed a mixed case complaint with the Department of Veterans Affairs in Case no. VA-0705-200C-2024-15696. After filing an informal complaint, Mr. Gause filed a formal complaint against the Department of Veterans Affairs. (VA or Agency) on September 18, 2024. Per 5 C.F.R. §§ 1201.154(a) & (b), upon the filing of a complaint, the agency must advise the complainant that if a final decision is not issued within 120 days of the date of filing the mixed case complaint, the complainant may appeal the claim to the MSPB at any time thereafter; or per 29 C.F.R. § 1614.310(g), may file a civil action but not both. On January 27, 2025, a contract

4

investigator for the United State Postal Service sent an email requesting an affidavit in the mixed case complaint. 120 days from September 18, 2024 appeared to be January 16, 2025. As of the date of the contractor requesting an affidavit from Mr. Gause, the case would have been 131 days old. Per 29 C.F.R. § 1614.302(d)(2), within forty-five (45) days following completion of the investigation, the agency must issue a final decision without a hearing before a Commission Administrative Judge. Therefore, the Agency had not only exceeded the 120 days but was still conducting the investigation. Upon completing the eeo investigative process, the contractor also had to send the case to the Agency for a final agency decision. (FAD) The FAD was required to be issued within 45 days of the completion of the investigation. Consequently, the Agency was going to well exceed the 120-day completion deadline for a mixed case.

3. The Agency had not completed its investigation nor responded to Mr. Gause email request for explanation of failing to timely complete the investigation and FAD. Mr. Gause e-filed his mixed case appeal with the MSPB on February 3, 2025. The parties conducted discovery and pre-hearing submissions and the Board set the case for hearing on May 29, 2025. On June 16, 2025, the Appellant move for dismissal without prejudice noting his intent to file the complaint with the district Court. The Board

5

granted the motion. 5 U.S.C. § 7702(e)(1)(B) permitted Mr. Gause to effectively end his MSPB appeal and instead file a civil action because more than 120 days had elapsed without the Board rendering its final decision. Mr. Gause exhausted his administrative remedies and jurisdiction is ripe before this Court. Mr. Gause contacted Pines Federal and several other attorneys to review the case and for representation in federal court due to his severe illness and other medical issues. After review, one firm did note potential bullying in the administrative proceedings before the MSPB. However, none of the contacted firms accepted the case either due to caseload, reduced practice or other reasons. He is now proceeding pro se and alert the Court to his possible future and varying need for ADA accommodations in prosecuting this case.

4.    After filing an informal complaint, Mr. Gause filed a formal complaint against the Agency on September 18, 2024. This complaint contained allegations of whistleblowing retaliation and removal which are appealable actions to the Board. Mr. Gause also alleged retaliation for voicing opposition to the Agency attempting to limit the thoroughness of his and other investigator's investigations. Mr. Gause noted the interferences with eeo investigations were due to allegiances to VA management officials and other internal/external vendors such as Office of General Counsel. (OGC)

6

Mr. Gause alleged that the Agency created a hostile work environment where it attacked and manipulated the performances of non-conforming investigators or employees. The Agency often bullied other employees with threats of termination, performance issues and manipulation of duties and exaggerated performance problems. Such conduct by the Agency was contrived to garner compliance with covert and overt verbal/written communications that investigators should conduct cursory investigations. The Agency wanted completed investigations that yielded quantity and mandatory production numbers over quality and required thoroughness. Mr. Gause also alleged that the agency retaliated against him for his participation in the eeo process as an investigator when he alleged that investigations lacked impartiality and were factually insufficient at times. Mr. Gause communicated to his department that the record development was often hampered by both his chain of command and internal/external employees who often exaggerated performance and customer service issues such as tone and methods. The exaggerations were often to influence the investigation in their favor or to retaliate against the investigator for any

7

slight[1] such as noting a claim that was purely whistleblowing[2] rather than eeo activity or mixed. The Agency and vendors often demanded that the investigator(s) conducted investigations in a manner acceptable to them rather than based on truth finding and Title VII requirements. Frequently, VA management made impermissible inquiries during investigations on behalf of the very officials named in pending eeo complaints. The Agency attempted to cloaked it as reasonable requests for information but the inquiries were really covert influence on the investigation such as limiting the types of questions on the affidavits. Additionally, such inquiries from VA management were unlawful conflicts of interest.

5.      During Mr. Gause's tenure as an eeo investigator from about August 2021 to May 2024, Mr. Gause filed numerous requests for a reasonable accommodation (RA) due to severe neurological damage that caused paralysis and severe pain in his arms, hands, and the cervical and lumbar areas of his spine. The Agency made numerous attempts to remove him for performance for a period of two and a half years. Some of the many attempts

---

[1] The Agency often used any unsubstantiated complaint by any party (Complainants, Management Officials, Representatives or Vendors) against certain investigators to allege performance or customer service issues to retaliate and garner conformance.

[2] Purely whistleblowing claims that are not mixed with eeo claims, or claims not nuanced such as retaliation for filing an eeo complaint, are filed in other venues such as with the MSPB or OSC. Nuances often occur in eeo complaints such as when federal employees, who are not versed in eeo law, filing a purely whistleblowing claim that has no eeo related facts with the agency eeo department. Despite the claim itself is not eeo related, if an agency retaliated for filing the claim, although in the wrong venue, it would still be liable for any possible retaliation by an agency despite the erroneous eeo filing.

were not initially disclosed but were uncovered during discovery at the Agency and Administrative proceedings. The Agency often communicated with OGC and other personnel for approval and framing of the many removal attempts. Additionally, to garner removal for performance problems, the Agency harassed Mr. Gause and manipulated the RA's interactive process for an approximate period of a year and half. The Agency would meet or communicate with him in private and attempt to coerce him to drop the RA requests or to perform some other action directed by management or Reasonable Accommodation Coordinators. (RAC) Later, the Agency would use their own directives as manipulated proof that he failed to cooperate or framed it as he voluntarily withdrew his accommodation requests. Many of the asserted defenses were post hoc admissions and/or derived from OGC during proceedings before the MSPB and/or EEOC[3].

6.    After Mr. Gause filed a prior eeo complaint with the Agency on July 25, 2023 in Agency No. 2023 VA-0705-200C-2023-152851 that is currently pending with the EEOC, Mr. Gause experienced numerous retaliatory events. Those events concerned eeo retaliation for participation and voicing opposition and retaliation for whistleblowing about eeo interference with the

[3] Mr. Gause had filed a prior eeo complaint titled VA-0705-200C-2023-152851 on July 25, 2023 for eeo retaliation and failure to accommodate with the agency and later with the EEOC. That complaint is still pending at the time of this filing. The prior complaint before the EEOC was sufficiently related to the later mixed case complaint and appeal that is the subject of this present complaint before this Court. It will also serve as background information.

9

eeo investigations. Additionally, the Agency engaged in disability discrimination and retaliation. The Agency denied his accommodation requests or failed to engage in good faith with Mr. Gause concerning his disability from about April 2022 till his termination/removal in May 2024. The first line supervisor, Troy Gilliam (Gilliam) noted that he would not discuss the accommodation because of Mr. Gause's eeo complaints against him. The Reasonable Accommodation Coordinators, Timothy Perkins and Colleen Vonderhaar (T. Perkins or Vonderhaar) often engaged in bad faith and harassing interactive discussions. RAC and/or the Agency also communicated in emails with OGC regarding his RA requests and regarding removal for performance. Administrative discovery revealed communications between RAC and the second line supervisor, Kevin Broussard (Broussard) discussing Gause's removal for performance.

7.   In addition, discovery revealed ridiculing comments in emails such as Broussard's and RAC's response to Gilliam's refusing to meet with Mr. Gause due to his allegations as being funny. Vonderhaar often refused to meet with Mr. Gause and instructed him to meet with Broussard. When meeting with Broussard, Broussard would often demand that Mr. Gause meet with Vonderhaar. The agency practiced such gamesmanship and bad faith, ad nauseum. Gause later requested to speak with T. Perkins, a RAC

10

supervisor. The conversation consisted of mostly a discussion about the work and personal background of T. Perkins. However, the conversation did not contain meaningful discussions about Gause's medical limitations or the actual requests for accommodation and specific requests such as a more flexible work schedule or the bad faith interactions by the Agency. T. Perkins discussed the general administrative process and the procedural aspects of the RA requests such as issuance of a denial and the appeal process. However, when Mr. Gause asked about what other information or medical evidence was needed, Perkins or Vonderhaar would say that there was nothing needed for submission. When Mr. Gause asked about why the references to medical information, RAC replied it was just a request to see if Mr. Gause voluntarily wanted to supply anything else. Later, the RAC would use this as post-hoc defense that the reference to medical information was an official request and Mr. Gause did not provide a response or support his RA request. Mr. Gause engaged with the agency regarding an effective accommodation from April 2022 to October 2023 and filed a prior complaint for that period of time. However, he never received any clear or effective response and continued to try to engage the Agency in discussions about an effective accommodation. Mr. Gause filed a second eeo complaint concerning his RA requests that was mixed with his May 29, 2024 removal.

This complaint was filed as a mixed case in Agency No. VA-0705-200C-2024-15696. The time period for this mixed complaint and present pleading before this Court was from about October 2023 to May 2024. After a period of the Agency failing to respond or late or inadequate responses, Mr. Gause started insisting on interactions for an effective accommodation. The insistence was related to the Agency's increased hostility and threats of termination due to performance issues and placement of Mr. Gause on Performance Improvement Plan. (PIP) Mr. Gause also was facing imminent deadlines and was experiencing more work scrutiny such as review of his investigations and work being designated as being untimely despite the timeliness.

8. Mr. Gause conveyed to the Agency that the eeo investigator work was nuanced, unpredictable and varying in nature and dependent on cooperation of many parties. Often because of parties' emotions and the nature of the consequences of allegations, the parties' self-interests worked to the detriment of the investigator. The investigator had to wait on availability of the Complainant, and if represented, the attorney and any non-attorney representative (Union or other persons) and then the availability of the witnesses and management witnesses. The investigator also had to take mandatory use or lose annual leave which could be a month or more. Many

VA employees were hired under special hiring such as veteran's disability and were dealing with medical issues. Investigations were mandated by legislature and law to be completed within 180 days unless an extension was granted. If an extension was granted, a possible additional 90 days was available. However, some investigations were not assigned to the investigator until three months to a few weeks prior to the mandated deadlines. Mixed complaints were due within 120 days. Often the complainants and attorney of record would manipulate the deadlines by not acknowledging requests for extensions of time until they, themselves needed more time to provide documents or responses to the investigator. This would cause the investigator to set aside any other work and then work tireless on that case just to receive an extension prior to the deadline. Additionally, attorneys would hope for missed deadlines and delay responding or be vague in whether they would give an extension in order to file requests for sanctions with the EEOC. Often investigated managers would be on sick leave or annual leave or could be doctors or other personnel that had critical and time sensitive duties. Therefore, the processing of eeo complaints consisted of gamesmanship, manipulation and delays where the investigator was dependent on others. This dependence was subject to manipulation by all parties. Delays would be exacerbated if the response by a manager

13

yielded a secondary request for information or clarity due to the response or naming of another witness or other evidence. The investigator would often face delays in the initial response and then would face additional delay in follow-up requests. An investigator such as Mr. Gause with a disability which impaired his typing, focus, and ability to sustain prolonged typing, sitting at a computer, and being able to redact, review and convert several hundreds or thousands of emails and other documents to PDF and type incessantly to meet deadlines was at the mercy of such variance without an effective accommodation. The investigator was also taxed with fixing software errors and formatting the Report of Investigation (ROI) for the EEOC. Many software errors were beyond the IT department and certainly were beyond most investigator's capabilities. In addition, some requests for certain formatting of the evidence and ROI were beyond that of the Agency database systems.

9.    Additionally, an investigator may receive a remand[4] from the EEOC or OEDCA with a short deadline which required as much or more work as the initial investigation. Remands were dependent on the assessment, temperament and subjectivity of the adjudicator.

---

[4] Remands are requests from OEDCA or EEOC to conduct additional investigations or gather more documents or witness testimonies or to clarify a statement of a witness or other fact-finding functions..

14

10. Such dependence on others and subsequent delays in time-sensitive investigations could be substantially minimized by an investigator performing cursory investigations and removing any verbal interactions with any respondent. In fact, many investigators soon found out they were rewarded for quantity over quality with high performance ratings and favoritism. Many investigators would just simply send affidavits and would not engage in in-person communications or severely limited interactions to a simple meet and greet of about a few minutes. Attorneys representing such complainants were very amenable to this because they could then submit answers that were reviewed or supplied by the attorney. The eeo training for investigators clearly noted that written affidavits were not the most effective way of gathering probative facts. Such affidavits were often ineffective because investigators had no clue to the true context and content of the complainant allegations because they never talked with anyone. However, as far as the Agency was concerned, this was preferred because it contributed to investigations being completed within a very short time or at least a lot quicker than verbal or face to face interactions.

11. For example, an investigator could be assigned a case and could review the claims and start immediately on preparing questions that were just template or "ready-made" from other investigations. If the template mentioned a

disability about PTSD and the current investigation was about physical ailments such as pregnancy, then they would just modify it to a one-fit all situation. However, there were situations such as when a claim stated that a complainant was discriminated against because he was Black and no one in the ORMDI noticed that the complainant was White. In that same investigation after a personal discussion with the complainant, the Complainant emphatically noted that they had not made any allegations of race discrimination. A template affidavit may or may not have captured this disparity depending on the Complainant's attention to detail or level of knowledge. Cursory investigations allowed investigators to quickly or in a quicker manner than face to face interactions send a completed investigation to the EEOC or final adjudication. Most complainants had trepidation about the Agency and would not seek a final decision by the Agency or OEDCA. EEO training for investigators detailed that many complainants are not represented and therefore, would not catch blatant deficiencies. Additionally, the Complainant would not have any clue as to what evidence needed to be developed in their own case. Investigator training noted that the EEOC AJ would quickly dismiss Complainants' cases in a summary decision due to the lack of evidence in the investigation.

16

12. Under ORMDI, in many situations where disability is the eeo factor, investigator's affidavits are created from standard template questions about medicine and disability and RA requests that center around physical limitations. However, in one actual investigation conducted by ORMDI, the complaint was about the fact that the Complainant saw the person that sexually assaulted them in the military and was experiencing trauma and distress. The Complainant wanted to be accommodated from having to be in the vicinity of that person. The Report of Investigation completed by the investigator contained not one iota of evidence or reference to those facts. In fact, the Administrative Judge (AJ) had no idea of what the case actually was about nor was the Complainant aware of the severe factual deficiencies and its effect on their complaint. Even if the Complainant had known the investigation was severely deficient of facts to prove the Agency's liability or failed to even accurately present his claims, the Complainant still did not know how to present such facts or correct the record or bring it to the attention of the AJ. The Complainant was helped by another employee. The Agency investigation is profoundly dependent on the competency of the investigator and the overall eeo processing.

13. Adjudicators and caselaw in both administrative and federal courts clearly note that in employment discrimination cases, there are hardly ever any

17

smoking guns[5]. ORMDI investigative culture is mostly an investigative process that is conducive for claims that have a smoking gun such as the manager sexually harassed the employee and there were witnesses and the manager admitted to making verbal and sexual statements. An investigator can then simply ask witness did you hear the manager make inappropriate remarks. Witness(es) would say, yes, I heard the manager say he like her body. This is open and shut minus any possible nuances.

14. However, even "open and shut" or "smoking gun" cases are mishandled by ORMDI because of its culture of deficient processing of complaints, lack of impartiality or conflicts of interest. During Mr. Gause's tenure as an investigator, ORMDI underwent a congressional inquiry[6] for the failure to investigate and interference with a sexual harassment complaint by a subordinate employee of ORMDI's senior management. The allegations claimed interference and impediment by the senior managers who were the

---

[5] Smoking gun refers to direct evidence of discrimination. In employment discrimination often such cases are proven by circumstantial evidence, inference or comparator evidence.

[6] The findings of the report are damning, disturbing, and frankly despicable. The report confirms much of what the whistleblowers shared with us, that **VA ORMDI office is full of misconduct** to the highest degree. This is unacceptable, but honestly not surprising given what the committee has continued to uncover. For months, these whistleblowers have told the committee how their leaders have failed them. I want you all to read this quote from one of the whistleblowers.

''Human Resources and Administration (HR&A) took a blind eye. They turned their head because of these relationships that they had with each other.

VA contracts with USPS to perform EEO, and discrimination and harassment claims filed by ORMDI employees or others considered to have a **conflict of interest**. At the suggestion of OAWP, we will review all USPS fact-findings from the past two years to ensure all issues raised have been properly addressed. Available at https://www.congress.gov/118/chrg/CHRG-118hhrg55077/CHRG-118hhrg55077.pdf

18

direct chain of command for Dr. Anne Marie Duncan[7][8][9] (Duncan or Dr. Duncan) and who are the immediate supervisors and/or chain of command for Broussard and other officials who are involved in this present complaint before this Court. Congress noted that the Agency appeared to have suppressed the investigation and had allegiances to the offender and other involved, senior managers. The allegations included texts from the senior manager asking for sexual favors from a subordinate and threating the employee for sex. The senior manager even boldly told the harassed subordinate, that in order to prove how he could affect her employment, he would fire another employee. The same manager also fired another mid-level manager[10] for sexual harassment of the same accuser against him. The termination of the other manager was not due to it being appropriate actions by the Agency but because the senior manager felt the second manager was competition.

---

[7] Duncan was the final decision maker for the removal of Mr. Gause and wasn't aware of many of the contributing factors such as prior eeo complaints against management officials who initiated the removal.

[8] All email communications between Ms. Gina Grosso, Mr. Jeff Mayo, Mr. Harvey Johnson, Mr. Archie Davis, Mr. Gary Richardson, [redacted], Ms. Laura Eskenazi, Mr. Robbie Barham, [redacted], **Dr. Anne-Marie Duncan**, Ms. Mary Kay Collins, and Ms. Perdita Abercombie since January 1, 2023. Available at https://veterans.house.gov/news/documentsingle.aspx?DocumentID=6348

[9] Because **Respondent Duncan** demonstrated a lack of awareness that some of her responses upon being notified of allegations of harassment could have been better attuned to the intent of Handbook 5979, OAWP recommends **Respondent Duncan receive training** regarding what actions are appropriate when management receives a harassment complaint. Available at https://osc.gov/Documents/Public%20Files/FY25/DI-24-000289,%20DI-24-000743/REDACTED%20DI-24-000289%20and%20DI-24-000743%20Agency%20Report%20Part%202.pdf (OAWP Report of Investigation 23-WashingtonDC-22984 at pg. 125)

[10] At one point, a senior manager fired a mid-level manager because both men wanted to sexually harass the same employee. When a complaint was filed, a political appointee sat on it, apparently partly for racial reasons. Available at https://legalinsurrection.com/2024/03/report-va-dei-office-has-a-hostile-toxic-work-environment-including-sexual-harassment/

15.    This was the culture of the ORMDI and investigators who failed to conform to cursory investigation were subjected to managers requiring them to re-type the investigation and add witnesses that the investigator did not deem necessary or requesting the investigator to contact the responsible managing official,[11] (RMO) who is required to participate, at least three times for lack of participation. ORMDI policies would then require that if a RMO of the VA did not respond to an investigation after three times, then the investigator needed to request the investigator's immediate supervisor to assist in garnering cooperation. If that didn't work, the senior manager would make an inquiry. ORMDI espoused many such policies to investigators, after the fact, due to wanting to limit any sanctions that would affect defending an eeo claim. However, there wasn't any such demands or policies regarding garnering the Complainant's testimony. However, when Mr. Gause voiced opposition or filed his eeo complaint noting the disparity of garnering management officials' testimony verses the Complainant's testimony, the Agency suddenly espoused that garnering a Complainant's testimony is an understood or inherent policy. The investigator was subject to numerous manipulations such as this which caused late investigations, performance issues, threat of termination and ultimately, conformance to

---

[11] Responsible Management Official (RMO) is the official under investigation or the named official in an eeo complaint.

20

cursory investigations. Many investigators worked vast amounts of hours off the clock and used a lot of production time trying to avoid being caught working off the clock by managers who overlooked favored investigators doing the same thing. In other words, even investigators conducting cursory investigations had to work off the clock. Therefore, the investigator trying to be thorough loss a vast amount of production time.

16. If an investigator insisted on mangers providing a sufficient response as required by regulations and the EEOC policies, the VA external managers (managers outside of ORMDI) would accuse the investigator of being rude or many other customer-service issues. The ORMDI managers and chain of command would then require time-lengthy responses to customer service complaints and then use such allegations in the performance ratings. Again, this was applied disparately to other investigators who had good production numbers and this was just another method to garner conformance. It was also used in a retaliatory manner for those who voiced any opposition to the way ORMDI processed complaints and how managers interfered in eeo investigations or impeded the investigations. Mr. Gause raised issues, such as the fact, that OGC, who often represented both ORMDI and external VA managers, could contact ORMDI management

officials and dictate what is included in the eeo investigations. OGC would cite policies from the EEOC that misrepresented the EEOC rulings. For instance, OGC would tell ORMDI that an investigator should not include past eeo history of named RMO's in an eeo complaint or to exclude certain documents because they determined it was work product. However, the determination of work product was not always an easy determination. Often an adjudicator would rule on such a complex issue at a later hearing rather than the administrative investigation phase. It was advantageous to the Agency to exclude any document under the auspice of work product that may have been advantageous to the complainant. Mr. Gause raised this as possible apparent bias or conflict of interest and the fact that it could cause the investigator to certify under oath that their investigation was complete and impartial while knowing that the investigation might have been tainted. ORMDI would suspiciously send out emails based on an unsupported OGC requests noting that an investigator could suffer disciplinary actions for a matter or work product privilege that was complex and beyond the abilities of average investigators. Again, for context, ORMDI and VA managers are represented by OGC and represented by some of the same attorneys who are dictating investigative policies to ORMDI.

17. Due to Mr. Gause's eeo activity and voicing opposition, the Agency became very hostile and threatened to terminate him multiple times during verbal calls and emails due to his performance issues caused by a lack of an effective accommodation. Mr. Gause receive numerous cautionary admonishments that VA management officials were contacting ORMDI about his investigative tenor and requested that Mr. Gause tone down his investigations. Mr. Gause's chain of command, Kevin Broussard, Rodger Evans and Tami Press engaged in numerous hostile acts over a period of time prior to his termination. Due to the Agency's failure to accommodate and failure to timely accommodate and/or provide an effective accommodation, Mr. Gause suffered severe pain in trying to meet imminent deadlines and varying duties and started having diminished recovery that became permanent.

18. On or about August 25, 2023, the Agency conducted a fact-finding for the removal of Mr. Gause due to misconduct. The Agency stated that Mr. Gause was inappropriate in emails with a Complainant, Kristian Perkins (K. Perkins) and her union representative, Monica Roberts. (Roberts) Mr. Gause was investigating the complaint filed by K. Perkins. The Agency obtained affidavits alleging that Gause disparaged the representative and accused the Complainant of making false statements. The Agency stated that Mr. Gause

23

did not provide the Complainant with a transcript of a recorded interview and communicated with the Complainant and the representative when asked not to do so by email from Broussard. Roberts" testimony noted that Gause was rude to her during a conversation about a union grievance concerning the Agency's interference with an eeo complaint. Mr. Gause noted in a customer service response that he had a good relationship with both parties up until Broussard's communications with the parties. Gause also noted that it appeared that Broussard was coercing the testimonies of K. Perkins and Roberts as a pre-text for disability and eeo retaliation and discrimination. Mr. Gause noted that the accusations against him occurred after the union grievance and after Roberts became hostile towards him over the phone regarding vague answers about the jurisdiction of the union over unlawful interference with eeo investigations.

19. The Agency used an email interaction with David Conboy, (Conboy) national eeo advisor for the VA to support the removal of Mr. Gause for misconduct. Mr. Gause was completing a remand assigned to him. Conboy sent an email requesting the status and Mr. Gause noted that he had received an extension from OEDCA. The point of contact was Jeanne Long. Conboy sent Gause an email inquiring whether Jeanne Long (Long) was with OEDCA. When Mr. Gause sent a response that Long was with OEDCA,

24

Conboy sent a terse email stating that all he required was a yes or no answer. Mr. Gause felt something was odd about the email. Conboy and Gause engaged in several email exchanges. Gause informed Mr. Conboy that he felt the email was inappropriate. Conboy then noted that he felt Mr. Gause's email was inappropriate and was accusing Conboy as knowledgeable about who granted the extension. Mr. Gause had interacted with Long and Conboy in similar extension requests. Mr. Gause notified his supervisor, Troy Gilliam that he felt that the email was harassment and likely due to some influence. Later during administrative discovery, the Agency revealed that Conboy was sent an email about Mr. Gause's behavior with K. Perkins and Roberts. Conboy had recommended that Mr. Gause be disciplined for the worst behavior of an investigator. Conboy's recommendation preceded his interaction with Mr. Gause about the extension. Mr. Gause stated in his email threads that the treatment by Conboy was that similar to a slave or low-class person. Gause took offense to Conboy commanding Gause to speak and answer as commanded rather than provide any clarity to Gause's responses. The Agency accused Mr. Gause of misconduct for the use of slave in his email and inappropriateness in the entire email. Later during discovery, Gause discovered that Gilliam had filed a response that inferred that Mr. Gause's email to Conboy was a racist attack. Mr. Conboy stated

25

that Mr. Gause was possibly racist against Conboy for being white. This was another coerced and contrived and exaggerated theater performance by the Agency as a pretext for disability and eeo discrimination and retaliation. Mr. Gause had filed prior eeo complaints naming Broussard, Gilliam and Evans as RMO 's. Broussard was the manager who forwarded the complaint about K. Perkins and Roberts to T. Perkins for his review. Gilliam was the manager who supported the claim filed by T. Perkins and added the exaggerated and inferred accusation that Mr. Gause used the word slave in an email to a white male.

20. There was a hostile work environment investigation conducted by the Agency as a "culture" or "temperature" check. The inquiries were sent to the eeo investigators assigned within Mr. Gause's department. (Continental District) The contract eeo investigator asked about a manager who had supported Mr. Gause's accusations against Broussard and had filed an eeo complaint against Broussard and the chain of command. Although, the investigators had all named various instances of harassment from sexual to abusive work practices from various managers, the contract investigator, Mark Sisto (Sisto) kept insisting on information about only one manager. During his initial contacts, Sisto only mentioned the manager, Charlyn Stewart. (Stewart) When Mr. Gause questioned the scope of the

26

investigation, the Contractor later modified some of the initial and verbal questioning about the named managers and the scope of the assessment. The contractor still was vague and inconsistent with the scope and wheter other managers would be assessed other than Stewart. Despite the vagueness and elusive scope promulgated by the contract investigator, Mr. Gause raised many of the issues of eeo interference, hostile work environment, manipulations and deficient investigations in his affidavit supplied to the contract investigator. Broussard and the chain of command was cc'd on the communications with Sisto. Sisto had noted that Broussard was the initiating manager for the culture check. Mr. Gause re-incorporates the above paragraphs where the OAWP report on the congressional inquiry about sexual harassment noted that the senior manager and accused harasser had used multiple abusive and curse words such as b—ch and other derogatory terms in community emails and the Agency took no actions. Brousard and Gilliam both had numerous informal and formal complaints about their abusive language and/or management styles. Many investigators had lodged several complaints and requested to be remove from their supervision. Mr. Gause raised this toxic work environment with the Agency many times. Again, this is the culture of ORMDI. The contractors and vendors often had allegiances to the Agency and involved themselves in "tattle tale" and

27

"informant roles" when the contractor's tenor, scope or apparent/actual bias was reasonably challenged by an employee of the VA. Additionally, the agency applied its policies disparately towards favored employees who conformed to the Agency's hostile, work culture. The Agency ignored any true, blatant and egregious misconduct of compliant investigators while exaggerating and framing any slight and perceived misconduct against non-conforming employees as conduct so detrimental to the Agency's welfare. The Agency was a masterful magician with countless slight of hand tricks that was rooted in pre-textual actions.

21. During the months preceding Mr. Gause's termination, Mr. Gause used a substantial amount of sick leave and then annual leave in lieu of sick leave. Mr. Gause noted that the Agency had failed to grant him an effective accommodation and was using his performance to threaten termination and performance improvement plans and other disciplinary actions. Mr. Gause suffered debilitating pain, dangerous high blood pressure, and paralysis in his legs and arms, headaches and blurry vision. Mr. Gause was facing imminent deadlines on so many cases but could not meet them without the accommodation. Mr. Gause was forced to use the majority of his leave. Evans, the first line supervisor, approved his leave for a long period of time. However, near the date of the final decision and termination issued by

28

Dr. Duncan, Evans approved Mr. Gause's leave. However, Broussard went in the leave database and changed it to AWOL later the same day. This was another example of retaliation and attempt by Broussard to give am exaggerated performance that Mr. Gause abandoned his job warranting termination. Although the letter of termination and the administrative process was based on misconduct to purposely avoid performance charges and thereby disability liability, Broussard in depositions and hearing testimony couldn't restrain himself from referring to Mr. Gause's poor performance as an investigator. Also, the letter of termination and fact finding all contained several references to Mr. Gause's performance rather than conduct. Again, the Agency entire administrative actions were pre-textual for eeo, whistleblowing and disability retaliation and/or discrimination.

22.   **COUNTS**

Paragraphs 1 through 21 are re-alleged and incorporated as if fully set forth herein each of the below Counts

### COUNT I

The Agency issued a letter of decision by Dr. Duncan terminating Mr. Gause's employment effective May 29, 2024. The Agency's termination was a pretext for Mr. Gause's eeo activity and opposition and whistleblowing retaliation,

and disability discrimination and retaliation and created a hostile work environment. Mr. Gause filed a prior eeo complaint against his chain of command and voiced opposition about the Agency's interference with the eeo investigations and allegiances to external/internal vendors. Mr. Gause also alleged disability retaliation and discrimination when the Agency failed to provide an effective accommodation under its continuing duty to accommodate.

## COUNT II.

In and about April 2024 and May 2024, the Assistant District Manager, Kevin Broussard denied Gause's request for sick leave and placed Mr. Gause in an AWOL status. Broussard's denial of annual leave in lieu of sick leave and denial of sick leave was not due to Agency's need but was a pretext for Mr. Gause's eeo activity and opposition and whistleblowing retaliation, and disability discrimination and retaliation. Mr. Gause filed a prior eeo complaint against his chain of command and voiced opposition about the Agency's interference with the eeo investigations and allegiances to external/internal vendors. Mr. Gause also alleged disability retaliation and discrimination when the Agency failed to provide an effective accommodation under its continuing duty to accommodate.

## COUNT III.

On or about April 24, 2024, the Western Region Director, Tami Press (Press) and various Agency personnel and the eeo contractor for USPS conspired

to confuse and delay harassment claims filed by Mr. Gause in the Harassment Prevention Program (HPP) process. A VA employee may file both non-eeo and eeo harassment claims with the HPP[12] office. Press had been named in Mr. Gause's prior eeo complaint and during an interaction with Mr. Gause gaslighted him on verbal communications about his accommodation. Press did not request any information and was asked by Mr. Gause what medical information was needed for her to issue a decision. Press was vague and elusive and finally stated nothing was needed. Mr. Gause had witnessed this tenor of elusiveness by the Agency several times and sent an email detailing the communications. Press sent a response email that mischaracterized and was blatantly false about the verbal communications and then attempted to state that it was Mr. Gause's fault for not cooperating. Press had contrived this same tenor with Charlyn Stewart, eeo supervisor when Stewart filed an eeo complaint against her and Broussard. Press was elusive about the detail of Stewart to another department and then when Stewart sent an email of the verbal conversation, Press's email contained mischaracterizations. Press actions were a pretext for Mr. Gause's eeo activity and opposition and whistleblowing retaliation, and disability discrimination and retaliation. Mr. Gause filed a prior eeo complaint against his chain of command

---

[12] The HPP was named in the OAWP and Congressional report as having may of the same deficiencies such as a lack of training and failure to investigate similar to ORMDI. Employees could file with HPP because it was mandated to address all forms of harassment and was to conduct investigations within a far shorter timeframe than an eeo investigation.

31

and voiced opposition about the Agency's interference with the eeo investigations and allegiances to external/internal vendors. Mr. Gause also alleged disability retaliation and discrimination when the Agency failed to provide an effective accommodation under its continuing duty to accommodate and created a hostile work environment.

## COUNT IV.

On or about February 29, 2024, Mr. Gause's Reasonable Accommodation request was denied by Western Region Director, Tami Press. Mr. Gause spoke with Ms. Press about his RA. Press refused to engage in any good faith discussions and could not address any detailed requests made by him, limitations and application to his job duties and any of his significant appeal rebuttal. Press was elusive and vague and inconsistent in statements about requiring any additional information. Press mischaracterized the verbal communications and without basis accused Mr. Gause of not cooperating. Press's actions were a pretext for Mr. Gause's eeo activity and opposition and whistleblowing retaliation, and disability discrimination and retaliation and created a hostile work environment. Mr. Gause filed a prior eeo complaint against his chain of command and voiced opposition about the Agency's interference with the eeo investigations and allegiances to external/internal vendors. Mr. Gause also alleged disability retaliation and

32

discrimination when the Agency failed to provide an effective accommodation under its continuing duty to accommodate.

## COUNT V.

On or about April 10, 2024, Mr. Gause's was issued a Notice of Proposed Removal from the District Manager. This proposed removal merged with the actual removal on May 29, 2024. Rodger Evans sent the proposed removal against Mr. Gause for various misconduct allegations. Evans was named by Mr. Gause in a prior eeo complaint that was pending at the time. Mr. Gause also voiced opposition with Mr. Evans and Mr. Broussard regarding the Agency's interference with eeo investigations and the abusive and toxic workplace created by the retaliatory actions of his chain of command and immediate supervisor, Troy Gilliam. Broussard's actions were a pretext for Mr. Gause's eeo activity and opposition and whistleblowing retaliation, and disability discrimination and retaliation and created a hostile work environment. Mr. Gause filed a prior eeo complaint against his chain of command and voiced opposition about the Agency's interference with the eeo investigations and allegiances to external/internal vendors. Mr. Gause also alleged disability retaliation and discrimination when the Agency failed to provide an effective accommodation under its continuing duty to accommodate.

## COUNT VI.

Two witnesses, Monica Roberts and Kristian Perkins, provided false testimony on August 25, 2023 that Mr. Gause contacted them without permission in order to support their own agendas and to act in concert with the Asst. District Manager, Kevin Broussard to manufacture a false narrative to remove Mr. Gause on May 29, 2024. Roberts and K. Perkins actions were conspiracy and coercion. Mr. Gause had interacted with Roberts regarding union jurisdiction over eeo interference by Agency managers. Roberts became hostile and sought retaliation for Mr. Gause eeo activity and opposition and used K. Perkins to further that retaliation. All three parties avail themselves of the opportunity to accomplish their self-interests by engaging in concert to make false allegations against Mr. Gause. Broussard's actions were a pretext for Mr. Gause's eeo activity and opposition and whistleblowing retaliation, and disability discrimination and retaliation and created a hostile work environment. Mr. Gause filed a prior eeo complaint against his chain of command and voiced opposition about the Agency's interference with the eeo investigations and allegiances to external/internal vendors. Mr. Gause also alleged disability retaliation and discrimination when the Agency failed to provide an effective accommodation under its continuing duty to accommodate.

34

## COUNT VII.

The Asst. District Manager and the District Manager, Kevin Broussard used a January 11, 2024 incident with David Conboy, National Advisor for EEO Investigators to support Mr. Gause's removal. Broussard had engaged with Conboy in communications regarding the interactions of Mr. Gause with K. Perkins and Roberts. Conboy recommended discipline and noted the egregious behavior presented in the allegations submitted by Brousard. Mr. Gause had not been privy to these covert communications and discovered them during discovery at the administrative process. Conboy in an unrelated incident, later engaged with Mr. Gause by emails regarding completing a remand from OEDCA. Conboy email and tenor made Gause's suspicious of some hidden motive to create conflict with Mr. Gause. Conboy knowing Broussard had contacted him to coerce a finding of misconduct acted on Brousard's behalf to exaggerate the email communications by Mr. Gause as some sort of racial attack on Conboy. Broussard was using Conboy as a "cats paw" for Broussard's retaliation and discrimination. Broussard's actions were a pretext for Mr. Gause's eeo activity and opposition and whistleblowing retaliation, and disability discrimination and retaliation and created a hostile work environment. Mr. Gause filed a prior eeo complaint against his chain of command and voiced opposition about the Agency's interference with the eeo investigations and allegiances to external/internal vendors. Mr. Gause also alleged disability

35

retaliation and discrimination when the Agency failed to provide an effective accommodation under its continuing duty to accommodate.

## COUNT VIII.

From about October 2023 to May 29, 2024 when Mr. Gause was terminated the Agency engaged in bad faith interactions and failed to provide him an effective accommodation. The Agency made fun of Mr. Gause's disability and tried to remove him for performance from the time he was hired on or about August 1,2021 till his termination on May 29, 2024. The Agency consulted Human Resources, OGC and other personnel to remove him for performance but later seized on exaggerated misconduct allegations by K. Perkins, Roberts and Conboy. Broussard engaged with Mr. Gause's accusers in order to manufacture misconduct chargers as a pre-text for disability and whistleblowing retaliation and/or discrimination and eeo activity. The Agency and Broussard's actions were a pretext for Mr. Gause's eeo activity and opposition and whistleblowing retaliation, and disability discrimination and retaliation and created a hostile work environment. On or about March 2024, the Agency placed Mr. Gause on a PIP despite failing to provide him an accommodation and/or an effective accommodation. On or about December 24, 2023, the District Manager ordered Mr. Gause not to contact OGC, OEDCA, or EEOC regarding clarification or other matters necessary to complete EEO investigations. On or about December 14,

36

2023, the attorney for Dr. Julie Plant reached out to the District Manager to influence the questioning methods of her client. The Agency failed to respond to Mr. Gause's inquiries about interference from representatives of Complainants and various other reported harassments. All of these incidences were retaliation and/or harassment reported by Mr. Gause and bases of a toxic workplace. Mr. Gause filed a prior eeo complaint against his chain of command and voiced opposition about the Agency's interference with the eeo investigations and allegiances to external/internal vendors. Mr. Gause also alleged disability retaliation and discrimination when the Agency failed to provide an effective accommodation under its continuing duty to accommodate. The Agency's campaign of retaliation and harassment was severe, maniacal and orchestrated causing irreparable harm and destroying any amicable working relationship.

**WHEREFORE, Plaintiff,** Mr. Gause requests that the Court award him the following relief:

(1) Award any grade increases

(2) If the court finds that the facts demonstrate that reinstatement is not possible; then to issue a determination of irreparable hostility and award front pay rather than reinstatement

(3) To reinstate Mr. Gause's retirement plan and to pay into the plan all losses and loss interests caused by the discriminatory actions of the agency and to pay specific

37

amount of the withdrawal that would not have been withdrawn but for the discriminatory and retaliatory actions of the Agency

(4) Restoration of the disability or pay differential for a comparable plan and the loss of short-and long-term disability that was grandfathered in at the time through allotments

(5) Award Plaintiff pain and suffering, and emotional distress damages up to the statutory maximum

(6) Award injunctive relief requiring the Agency to fully comply with Title VII and not to discriminate against persons with disabilities or persons who participate in eeo activity or voice eeo opposition

(7) Expunge any and all negative disciplinary and performance records and correct ratings where the Agency failed provide an effective accommodation

(8) If restoral to position is possible then to grant an effective accommodation of maxi-flex to accommodate the variance of the job duties

(9) Restore all annual and sick leave taken by Mr. Gause due to the Agency's failure to provide an effective accommodation

(10) Mr. Gause suffers from a debilitating, progressive and chronic neurological injury and is facing imminent and irreversible medical harm, lack of complete medical care due to lack of health insurance, bankruptcy, collections, repossessions and potential foreclosure and homelessness as a veteran. Given the lengthy and

contentious discovery in the EEOC and MSPB, Mr. Gause respectfully request this Court to expedite this action in every way pursuant to 28 U.S.C. § 1657 (a); and

(11) award all pre/post judgment interests, actual and compensatory damages, back pay, front pay, and all associated benefits attorney fees in the present proceedings and underlying administrative proceedings, enhancement of fees, restoration of leave, training, and adverse action against those offenders who were deliberate in their actions and all available relief under Title VII any other title cause herein this complaint,

(12) grant such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests trial by jury for all claims herein.

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing petition was filed December 30, 2025 and will be delivered in person or by my agent or delivered by courier with receipted delivery or sent by certified mail, e-filing or sent by telephonic document transfer before 5:00 p.m. of the recipient's local time to the U.S Attorney Office agent for service on Defendants of the United States and/or Defendants at the last known addresses upon issuance of summons and location of parties.

*Harold M. Gause*

Harold K. Gause (Pro Se)
20019 Sweetgum Forest Dr
Humble, Texas 77346
281-455-5078/PH
E-mail: kirbygause@gmail.com

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Harold K. Gause

## DEFENDANTS

Department of Veterans Affairs

**(b)** County of Residence of First Listed Plaintiff   Harris
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Harris
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [X] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane / 365 Personal Injury - Product Liability | 690 Other | 423 Withdrawal 28 USC 157 | 376 Qui Tam (31 USC 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability / 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability / Product Liability | | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine / 368 Asbestos Personal Injury Product | | 835 Patent - Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability / Liability | | 840 Trademark | 460 Deportation |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle / **PERSONAL PROPERTY** | **LABOR** | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced and Corrupt Organizations |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability / 370 Other Fraud | 710 Fair Labor Standards Act | | 480 Consumer Credit (15 USC 1681 or 1692) |
| 190 Other Contract | 360 Other Personal Injury / 371 Truth in Lending | 720 Labor/Management Relations | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| 195 Contract Product Liability | / 380 Other Personal Property Damage | 740 Railway Labor Act | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 196 Franchise | 362 Personal Injury - Medical Malpractice / 385 Property Damage Product Liability | 751 Family and Medical Leave Act | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| | | 790 Other Labor Litigation | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | 791 Employee Retirement Income Security Act | 864 SSID Title XVI | 891 Agricultural Acts |
| 210 Land Condemnation | [X] 440 Other Civil Rights / **Habeas Corpus:** | | 865 RSI (405(g)) | 893 Environmental Matters |
| 220 Foreclosure | 441 Voting / 463 Alien Detainee | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | [X] 442 Employment / 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 240 Torts to Land | 443 Housing/ Accommodations / 530 General | | 871 IRS—Third Party 26 USC 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment / 535 Death Penalty | **IMMIGRATION** | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | 446 Amer. w/Disabilities - Other / **Other:** | 462 Naturalization Application | | |
| | 448 Education / 540 Mandamus & Other | 465 Other Immigration Actions | | |
| | / 550 Civil Rights | | | |
| | / 555 Prison Condition | | | |
| | / 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C 1331, 1346

Brief description of cause:
Title VII Federal Employment Law

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [X] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   12/30/25 –ltc

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____